Filed 2/21/25; Certified for Publication 3/24/25

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re H.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>M.D.,<br><br>    Defendant and Appellant. | F088486<br><br>(Super. Ct. No. JV8387)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tuolumne County. Hallie Gorman Campbell, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, and Maria Sullivan, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Franson, J. and Snauffer, J.

M.D., mother of minor H.M., appeals from orders terminating her parental rights. (Welf. & Inst. Code, § 366.26.)[1] Mother argues noncompliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law, by the Tuolumne County Department of Social Services (department). Specifically, she argues the department prejudicially erred in failing to comply with ICWA's affirmative and continuing duty of inquiry and adequately documenting its efforts to do so.

We find no error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

We limit our recitation of the background information to that necessary for disposition of the appellate issue.

*Referral and Initial ICWA Inquiry*

In April of 2023, the department responded to a referral that mother and newborn H.M. both tested positive for "Cannabinoids/THC and amphetamines." Mother denied substance use and declined to provide a urine sample. Father acknowledged knowing that mother used methamphetamine throughout her pregnancy. Father tested presumptive positive for amphetamines, methamphetamines, and THC, which he claimed was due to having had sex with mother, who was using drugs. H.M. was placed into protective custody.

When asked by the social worker about Native American ancestry, mother reported that she was adopted and did not know. Father reported Native American ancestry from the Blackfeet tribe, but had no further information.

On May 5, 2023, the department mailed relative notification letters, including an ICWA-020 form, a JV-285 relative information form, and a three-page questionnaire to 15 identified relatives. Mother's biological cousin, Amanda N., called the department to

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

express interest in placement.  Amanda N.'s mother, Marie M., and mother's biological father, Fred J., are siblings.  Amanda N. did not know if she had any Native American ancestry.  Amanda N. was informed by the department that she was not approved for placement.  She then informed the social worker of her sister and mother's cousin, Desiree P. who also expressed interest in placement of H.M.  Desiree P. reported that she did not have any Native American ancestry and that she would like to be considered for placement of H.M.

In May of 2023, the department met with mother and father to discuss paternity.  Both acknowledged that father was not H.M.'s biological father, although he did sign the appropriate paperwork at the hospital that he intended to be H.M.'s father.  Mother refused to say who the biological father was.

*Detention*

The detention hearing was held May 23, 2023.  Both mother and father were present, and both submitted on the department's report.  The juvenile court made a prima facie finding that H.M. was a person described by section 300 and there was a substantial danger to his physical health if left in mother or father's custody.

The juvenile court noted the information in the department's report that the ICWA may apply and that H.M. may be an Indian child, and that "additional work" was needed in regard to that information.  The juvenile court advised mother and father that they were to inform the court if they received information about H.M.'s Indian ancestry.  They were also told to complete and submit an ICWA-020 form.  Jurisdiction was set for June 5, 2023.

Mother completed the ICWA-020 form indicating that she and/or H.M. may be a member of or eligible for membership in the Cherokee tribe, and that "Richard D[.] great grandma" were either a member of or eligible for membership in a federally recognized tribe.  Father completed the ICWA-020 indicating that he did not have any Indian heritage.

3.

*Jurisdiction*

The department's report for the jurisdiction hearing indicated that both mother and father refused to sign any substance use testing guidelines and were not participating in random testing. Both had tested positive for amphetamines and methamphetamines, and presumptively positive for THC on three separate occasions. The department's report noted that there was reason to believe H.M. was an Indian child, and it detailed inquiries that were conducted with mother, father, Amanda N. and Desiree P. Mother and father both repeated what they had reported on the ICWA-020 forms.

Both mother and father were present at the jurisdiction hearing June 5, 2023, which was continued at father's request to June 26, 2023.

On June 8, 2023, the department attempted to contact H.M.'s other potential biological fathers. One, Benjamin D., stated he was not interested in ascertaining whether or not the child was his and did not want to become involved in the case. The department was unable to locate another, Justin M. The third, Ruben D., was in custody in jail and refused to take a DNA test, stated there was no possibility that he was the father.

The June 26, 2023, jurisdiction hearing was continued to July 10, 2023, as father was now incarcerated.

On July 5, 2023, the department received a voicemail from Taylor M., a biological cousin of mother's (and youngest sister of Amanda N. and Desiree P.), stating that she and her wife were licensed foster parents in Merced County and interested in placement of H.M. The department later inquired of Taylor M. about her Native American ancestry and she stated she had no reason to believe she had any.

At the July 10, 2023, jurisdiction hearing both mother and father were present and submitted on the department's report. The juvenile court inquired of both mother and father as to any Indian background. Father stated he was not the biological father, so it would not really matter, but that his father had said he does have Native American

4.

ancestry, but he did not know if that was true. Mother's counsel stated mother does have Native American ancestry and she had spoken to the social worker about it.

The juvenile court found the allegations of the petition true and ordered H.M. continued in out of home care. The disposition hearing was set for July 24, 2023.

On July 11, 2023, the department's legal clerk resent letters with H.M.'s corrected date of birth to all three federally recognized Cherokee tribes: the United Keetowah Bank of Cherokee Indians in Oklahoma, the Cherokee Nation, and the Eastern Band of Cherokee Indians. A corrected letter was also resent to the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana.

The Cherokee Nation responded on July 14, 2023, that H.M. could "possibly" be connected to the tribe through maternal grandmother and paternal grandmother, but that they needed either a middle name or birth date for Theresa G. and Michelle C. in order to make an accurate determination. Both the Eastern Band of Cherokee Indians and the United Keetowah Band of Cherokee Indians responded that H.M. was neither registered nor eligible for membership in their tribe.

On July 18, 2023, mother completed a psychological review stating that her adoptive mother passed away when mother was 14; her adoptive mother's brother, who mother considered a father figure, had passed away from cancer; and her sister had died from a fentanyl overdose. Mother stated that she did not really know her biological family and felt that her cousins were strangers.

_Disposition_

The department's disposition report recommended mother and father receive reunification services, although both mother and father were reluctant to participate in drug treatment and neither thought it was an issue or reason for H.M.'s out of home placement. Both mother and father continued to test positive for amphetamines and methamphetamine, and presumptive positive for THC. The report again noted that there was reason to believe H.M. was an Indian child as defined by the ICWA.

5.

At the scheduled disposition hearing July 24, 2023, both mother and father were present and both requested a one week continuance to July 31, 2023.

Also on July 24, 2023, the department received a follow-up response from the Cherokee Nation stating that H.M. could possibly be connected to the tribe through maternal grandmother, Theresa G., but without a middle name and/or birth date, they could not make that determination.

At the subsequent July 31, 2023, hearing, the juvenile court asked mother if she had given the department information as to whether H.M. was an Indian child; mother said she had. H.M. was declared a dependent of the juvenile court and mother and father ordered to participated in reunification services. A six-month review hearing was set for January 8, 2024.

On August 3, 2023, the department's legal clerk emailed a letter to the Cherokee Nation in response to its request and provided Theresa G.'s full name, including her middle name, but advised the tribe that the department was unable to obtain maternal grandmother's date of birth. The Cherokee Nation did not respond to this correspondence.

In October of 2023, Armando G. contacted the department and reported that he believed he was H.M.'s father. Mother stated that was not possible and she believed he was only saying that to try to help her. Armando did not respond further to paternity testing.

In December of 2023, father told the department mother wanted to "split the case plan" with the biological father, who was a neighbor, Cody J. Mother declined to confirm that Cody J. was H.M.'s biological father. Mother stated that she knew who H.M.'s father was, but would not say. The department was not able to locate any additional information about Cody J.

*Six-Month Review*

The six-month review hearing report recommended H.M. remain in out of home care and that family reunification services be terminated for both mother and father and a section 366.26 hearing be set. Neither mother nor father had followed through on the reunification plan. The report now stated that there was no reason to believe H.M. may be an Indian child and detailed and attached the letters received from the three Cherokee tribes.

The January 8, 2024 six-month review hearing was rescheduled for a contested hearing on February 21, 2024. Mother was present at the contested review hearing; father was not. The department and counsel for H.M. submitted on the report. Father's counsel entered a denial and objection to termination of services, but offered no evidence. Mother testified that she believed she had her drug problem under control. The juvenile court terminated services for mother and father and set a section 366.26 hearing for June 10, 2024.

*Section 366.26 Hearing*

The department's report for the section 366.26 hearing recommended parental rights be terminated and adoption be ordered for the permanent plan for H.M. The report again indicated there was no reason to believe H.M. was an Indian child based on the inquiry that was made and the responses received. The department had received no new information. The department requested that the juvenile court find that H.M. was not a Native American child as defined by the ICWA.

The scheduled June 10, 2024, hearing was rescheduled for a contested hearing July 15, 2024. Mother and father were both present. Mother testified that she had been clean for seven or eight months although she had not attended an AA or NA meeting recently or talked to her sponsor in a month or two. She also testified that she was going to school, and she wished H.M. placed with her cousin Taylor M., as she was family.

The juvenile court found H.M. was both generally and specifically adoptable and the beneficial parent child relationship exception to adoption did not apply. The juvenile court terminated mother and father's parental rights. The minute order for the July 15, 2024 hearing stated that the juvenile court adopted the findings as set forth in the department's report, which would include a finding that the ICWA was inapplicable as to H.M. A six-month post permanency planning hearing was scheduled for December 30, 2024.

## DISCUSSION

*General Legal Principles and Standard of Review*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The juvenile court and the department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)[2]

The protective provisions of ICWA turn on a determination of whether a minor is an "Indian child" as defined by statute. (25 U.S.C. § 1903(4).) "A determination by an Indian tribe that a child is or is not a member of, or eligible for membership in, that tribe, or testimony attesting to that status by a person authorized by the tribe to provide that determination, shall be conclusive." (§ 224.2, subd. (h); see rule 5.481(b)(4); 25 C.F.R.

---

[2] All further refences to the rules are to the California Rules of Court.

8.

§ 23.108 (2024).)  Of course, a tribe may only make such determination, or exercise its right of intervention, if it is made aware of the ongoing proceedings. Accordingly, the scheme requires the appropriate tribe be notified when the court or county welfare agency has *reason to know* the child is Indian.  (§ 224.3, subd. (a); see U.S.C. § 1912(a); 25 C.F.R. § 23.111(a) (2024).)

Fulfilling the notification duty requires sufficient inquiry into the child's native heritage. "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child ... [facing a dependency or delinquency proceeding] is or may be an Indian child."  (§ 224.2, subd. (a); rule 5.481(a).)  California's statutory scheme imposes a duty of initial inquiry on both the department and the court.  The inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  Then, on the first appearance upon a petition, the court shall ask each participant present in the hearing whether the participant "know or have reason to know that the child is an Indian child."  (§ 224.2, subd. (c); rule 5.481(a)(2); C.F.R. § 23.107(a) (2024).)

At issue here is a duty of *further* inquiry, which exists when "the court, social worker, or probation officer has *reason to believe* that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child ...."  (§ 224.2, subd. (e), italics added.) There is reason to believe a child is Indian when there exists "[i]nformation suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership in an Indian tribe."  (§ 224.2, subd. (e)(1); see *id.*, subd. (d).)  Further inquiry includes, but is not limited to, interviewing the parents and extended family members, contacting the BIA and the State Department of Social Services for assistance,

9.

and contacting the relevant tribe and "any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C); see *id.*, subd. (e)(2); rule 5.481(a)(4).)

If proper inquiry reveals information creating reason to know a minor is an "Indian child," the relevant tribe must be notified, and "the court shall treat the child as an Indian child unless and until the court determines on the record and after review of the report of due diligence ... and a review of the copies of notice, return receipts, and tribal responses ... that the child does not meet the definition of an Indian child ...." (§ 224.2, subd. (i)(1); see rule 5.481(b)(3); C.F.R. § 23.107(b) (2024).)

"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314, overruled on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.) Not every error by an agency or department in discharging its duties under section 224.2 will undermine the court's ICWA finding, but the court's ability to exercise discretion in this regard is dependent on adequate record development by the department. " ' "On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes." ' (*In re Kenneth D.* ([2024] 16 Cal.5th 1087] at pp. 1101-1102; see also *In re H.B.* (2023) 92 Cal.App.5th 711, 721.)" (*In re Dezi C., supra,* at p. 1141.)

<u>Analysis</u>

Here, mother gave reason to believe that H.M. was an Indian child when she stated that she had Cherokee heritage through an ancestor. The Cherokee tribes were inquired of, but mother claims the extent of the information given to the tribes, as well as which relative or relatives were the source of the information, was not documented. Mother also contends further inquiry was required by the department of extended family, the

tribes and the BIA. And she also contends the department was required to contact the Cherokee Nation a second time, after the department provided the Cherokee Nation with the additional information it requested. As we explain below, we disagree with mother that the failures she alleges are sufficient to show error in the context of this case.

To synopsize what was chronicled above, the department and juvenile court conducted inquiries throughout the proceedings, as documented in the record. Prior to the filing of the petition, the department asked mother and father about H.M.'s possible Indian heritage. Mother completed an ICWA-020 in which she indicated that she is or may be a member of or eligible for membership in a tribe through a relative, naming "Richard D[.], great grandma" in that category.[3] At the detention hearing, the juvenile court noted the ICWA information and stated, "there's some additional work that needs to be done with regard to that." At the contested jurisdiction hearing, the juvenile court noted that it had reason to believe H.M. may be an Indian child due to reported Indian ancestry. Mother's counsel informed the juvenile court that mother had spoked to the social worker about her Native American ancestry. At the disposition hearing, the juvenile court asked mother whether she had given the department any information about whether H.M. was an Indian child, and mother replied that she had. The juvenile court advised mother to give the department any further information she obtained.

In early May of 2023, prior to the detention hearing, mother's biological family reached out to the department to request placement of H.M. At that time, the department inquired about ICWA with each of them. Amanda N., one of mother's cousins, indicated that she did not know whether she had Native American ancestry. Amanda N.'s sister,

---

[3]     Father at one point stated he had Blackfeet but completed the ICWA-020 marked Native American ancestry as "None." We will not address father further in this analysis as he is not H.M.'s biological father. Only biological fathers are at issue under the ICWA. (See *In re E.G.* (2009) 170 Cal.App.4th 1530, 1533 [until biological paternity is established ICWA is not implicated].)

11.

Desiree P. denied any Native American ancestry, and her other sister, Taylor M., said she had no reason to believe she had any Native American ancestry.[4]

Based on mother's assertion that she believed she had Cherokee heritage, the department mailed out inquiry letters to all three federally recognized Cherokee tribes. Two responded that H.M. was not recognized as a member or eligible for membership in that tribe. The Cherokee Nation indicated on July 14, 2023, that H.M. could possibly be connected to the tribe through maternal grandmother and paternal grandmother, but they needed a middle name or date of birth for Theresa G. and Michelle C. in order to make an accurate determination. Ten days later, the department received a follow-up letter from the Cherokee Nation that H.M. could possibly be connected to the tribe through maternal grandmother, Theresa G., but a middle name and/or date of birth was needed to make that determination. On August 3, 2023, the department provided maternal grandmother's full name, including her middle name, but advised that the department was not able to obtain grandmother's date of birth. No response was received from the Cherokee Nation to this correspondence.

Mother argues that she gave the department reason to believe H.M. might be an Indian child. The department does not dispute this and cites the record — the detention, jurisdiction, and disposition reports — all of which indicate the same. Furthermore, the juvenile court made a finding at the jurisdiction hearing that there was reason to believe H.M. might be an Indian child, and the department subsequently made inquiries as to such, including mother's cousins Amanda N., Desiree P., and Taylor M. The department then further inquired of all potential federally recognized Cherokee tribes identified by mother. Two of those tribes responded that H.M. was not eligible for membership or recognized as a member of the tribe. And when the Cherokee Nation requested a "middle

---

**4** Mother, in her reply brief, claims Amanda N., Desiree P., and Taylor M., are mother's biological cousins on her paternal, not maternal, side. In a letter to the court, Taylor M., states mother "is cousins with Taylor M[.] on her mother's side."

name and/or date of birth" for maternal grandmother, Theresa G., the department provided grandmother's full name but stated it was unable to ascertain her birth date. The Cherokee Nation did not respond to that correspondence. It is also noted that the juvenile court addressed the issue of the ICWA at each hearing, inquired as to its continued applicability, and advised mother to provide any information she might receive about her possible Native American ancestry.

We disagree with mother's claim that a reasonable ICWA inquiry obligated the department to again contact the Cherokee Nation after it had already provided all of the information it had requested. While mother claims the department gave the Cherokee Nation only part of the information it requested, the Cherokee Nation had requested maternal grandmother's "middle name and/or date of birth," suggesting that they wanted either a middle name or a date of birth or both. In this case, the department provided the middle name but was unable to ascertain the birth date. Mother does not cite, nor is there any, authority for her proposition that the department was again required to follow up with the Cherokee Nation.

We also find no merit to mother's contention that the department erred by failing to contact the BIA or State Department of Social Services. As part of the department's duty of further inquiry, it must contact the BIA "for *assistance in identifying the names and contact information* of the tribes in which the child may be a member, or eligible for membership in." (§ 224.2, subd. (e)(2)(B), italics added.) Here, mother claimed Native American heritage via the Cherokee Tribe, and the record does not suggest the department was unable to obtain the name and contact information for the tribe. Just the opposite, the department successfully contacted all three federally recognized Cherokee tribes, and the tribes responded to the department's inquiries. Accordingly, the department's duty of further inquiry did not require it to contact the BIA because it did not need assistance identifying name or contact information for the tribes. (§ 224.2, subd. (e)(2)(C).)

13.

Finally, mother argues that the documentation on any inquiry in this case was not adequate for the juvenile court to know whether all possible maternal relatives were contacted for the possible missing birth date of maternal grandmother.  However, section 224.2, subdivision (e), which provides that proper inquiry be made, does not detail what specific documentation is required when conducting further inquiry.  In *In re M.W.* (2020) 49 Cal.App.5th 1034, the appellant alleged that the information provided the juvenile court in a declaration upon which the juvenile court relied failed to include information, including contact information for the tribal agents contacted, the minor's "ICWA Family Tree", return receipts from the various tribes, and the actual responses from the tribes.  Appellant also took issue with the fact that the ICWA declaration was not signed under penalty of perjury.  The court in *M.W.,* responded as follows:

> " … [S]ection 224.2, subdivision (e) does not require that the Department report its inquiry efforts to the juvenile court in the form of a declaration or in any particular form at all.  The only guidance in that regard can be found by analogy to subdivision (g) of that section (applying specifically to circumstances where there is 'reason to know') which permits the court to confirm the Department's due diligence' by way of report, declaration, or testimony included in the record. (§ 224.2, subd. (g).)  Here, the Department provided evidence of its due diligence inquiry via a report and testimony at the July 10, 2019, hearing.  This [appellant's] claim that the 'declaration' was not signed under penalty of perjury fails." (*In re M.W., supra,* 49 Cal.App.5th at p. 1046.)

The court in *M.W., supra,* further found that it was not necessary to provide the "family tree" to the juvenile court, but merely to indicate that it had contacted extended family, contacted the tribes as required, and to provide a report of the tribes' responses.  (*Id.* at pp. 1046-1047.)

Here, as documented by the record, the department inquired of multiple extended family members, and multiple tribes.  The extended family members did not provide any reason to believe ICWA applied.  The department also received letters from all but the Cherokee Nation stating H.M. was not an Indian child.  As for the Cherokee Nation, the

department responded and provided the requested information, but the Cherokee Nation failed to notify the department after receiving that information.

We reject mother's challenge to the juvenile court's determination that the department's inquiry into possible Native American heritage was adequate and that the ICWA did not apply. "Although the [department] could have documented some of its efforts in more detail, it provided sufficient information to support the [juvenile] court's findings." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1054.)  In *In re Dezi C., supra,* 16 Cal.5th 1112, different majorities of our Supreme Court held such determinations are reviewed for substantial evidence (*id.* at pp. 1134, 1141), and do not require an exhaustive inquiry that "leave[s] no stone unturned" (*id.* at p. 1153 (conc. opn. of Kruger, J.), p. 1167 (dis. opn. of Groban, J.)).

The juvenile court's finding, based on the evidence provided, that there was no reason to know H.M. was an Indian child and that the ICWA did not apply, was supported by substantial evidence.

## DISPOSITION

The juvenile court's orders are affirmed.

Filed 3/24/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re H.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.D., <br><br> Defendant and Appellant. | F088486 <br><br> (Super. Ct. No. JV8387) <br><br><br> **ORDER GRANTING REQUEST FOR PUBLICATION** |

As the nonpublished opinion filed on February 21, 2025, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

FRANSON, J.

WE CONCUR:


Levy, Acting P.J.


Snauffer, J.